**POMERANTZ LLP**
Jonathan Lindenfeld
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jlindenfeld@pomlaw.com

***Attorney for Plaintiff***

[Additional counsel on signature page]

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| CHONGHO CHOI, Individually and on Behalf of All Others Similarly Situated, | Civil Action No.: |
| *Plaintiff*, | CLASS ACTION COMPLAINT |
| v. | JURY TRIAL DEMANDED |
| IMMUNOMEDICS, INC., MICHAEL PEHL, MICHAEL R. GARONE, and USAMA MALIK, | |
| *Defendants*. | |

Plaintiff Chongho Choi ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Immunomedics, Inc. ("Immunomedics" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the

1

Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Immunomedics securities between February 8, 2018 and January 18, 2019, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act.

4.      Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the Company's principal executive offices are located within this Judicial District.

5.      In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of a national securities exchange.

## PARTIES

6.    Plaintiff, as set forth in the attached Certification, acquired the Company's securities at artificially inflated prices during the Class Period and were damaged upon the revelation of the alleged corrective disclosures.

7.    Defendant Immunomedics is a Delaware company with its principal place of business in Morris Plains, New Jersey. The Company's stock trades on the Nasdaq Global Market ("NASDAQ") under the ticker symbol "IMMU".

8.    Defendant Michael Pehl ("Pehl") has served as the President and Chief Executive Officer of Immunomedics since December 7, 2017.

9.    Defendant Michael R. Garone ("Garone") served as the Company's Chief Financial Officer from July 2017 until his resignation on August 23, 2018.  Under the terms of Garone's resignation, he will remain as Vice President of Finance until May 18, 2019.

10.    Defendant Usama Malik ("Malik") has served as the Acting Chief Financial Officer of Immunomedics since August 23, 2018.

11.    Pehl, Garone and Malik are sometimes referred to herein collectively as the "Individual Defendants".

12.    The Individual Defendants possessed the power and authority to control the contents of the Company's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive

representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS[1]

### Background

13.     The Class Period begins on February 8, 2018, when the Company filed its Form 10-Q for the quarterly period ended December 31, 2017.  In the filing, the Company described itself as "a clinical-stage biopharmaceutical company that develops monoclonal antibody-based products for the targeted treatment of cancer and other serious diseases[,]" whose "immediate priority is to commercialize our most advanced ADC product candidate, sacituzumab govitecan ("IMMU-132"), beginning in the U.S., with metastatic triple-negative breast cancer ("mTNBC") as the first indication." To that end, the Company announced that it "plan[ned] to submit a Biologics License Application ('BLA') to the United States Food and Drug Administration ('FDA') by the end of May 2018 for accelerated approval of sacituzumab govitecan for the treatment of patients with mTNBC who have failed at least two prior therapies for metastatic disease."

14.     Discussing sacituzumab Govitecan/IMMU-132, the filing stated:

Sacituzumab govitecan has been studied in over 500 diverse cancer patients in more than 15 types of solid cancers, with the dose of 10 mg/kg given on days 1 and 8 of repeated 21-day cycles being the established dose regimen. Sacituzumab govitecan received Breakthrough Therapy Designation from the FDA for the treatment of patients with mTNBC who have failed at least two prior therapies for metastatic disease. The FDA has also granted sacituzumab govitecan Fast Track designation for the treatment of patients with mTNBC and for patients with SCLC, or NSCLC. Sacituzumab govitecan has also been designated an orphan drug by the FDA for the treatment of patients with SCLC or pancreatic cancer in the U.S. and by the European Medicines Agency ("EMA") for the treatment of patients with pancreatic cancer in the European Union.

---

[1] Emphasis added throughout unless otherwise noted.

15.     Moreover, the Company claimed that its  "[i]nitial results from a single-arm Phase 2 study in heavily-pretreated patients with mTNBC" were "encouraging" and "will be part of a BLA package, which the Company plans to submit to the FDA for accelerated approval of sacituzumab govitecan as a third-line treatment for patients with mTNBC by the end of May 2018." Moreover, the Company stated that "[a] prerequisite for FDA acceptance of the BLA filing is to have a confirmatory Phase 3 trial to be underway at the time of BLA submission. To that end, we initiated and dosed the first patient in the confirmatory Phase 3 ASCENT study in November 2017, thereby satisfying FDA's requirement."

16.     The Company also claimed that its "product is subject to strict quality control and monitoring which the Company performs throughout the manufacturing process."

17.     Discussing the product approval process in the United States, the filing acknowledged that "[t]he FDA reviews the BLA to determine, among other things, whether the proposed product is safe, pure and potent, which includes determining whether it is effective for its intended use, and whether the product is being manufactured in accordance with cGMP, to assure and preserve the product's identity, strength, quality, potency and purity."  Additionally, the Company discussed the stringent FDA approval  process, stating in relevant part:

> *If we, or our collaboration partner, cannot successfully and efficiently manufacture the compounds that make up our products and product candidates, our ability, and the ability of our collaboration partner, to sell products and conduct clinical trials will be impaired.*
>
> Our ability to conduct our pre-clinical and clinical research and development programs depends, in large part, upon our ability to manufacture our proprietary compounds in accordance with the FDA and other regulatory requirements. We have limited historical experience in manufacturing these compounds in significant quantities, and we may not be able to do so in the quantities required to commercialize these products. Any interruption in manufacturing at this site, whether by natural acts or otherwise, could significantly and adversely affect our operations, and delay our research and development programs.

We and our collaboration partner also depend on third parties to provide certain raw materials, manufacturing and processing services. *All manufacturers of pharmaceutical products must comply with current Good Manufacturing Practice regulations or cGMPs, required by the FDA and other regulatory agencies. Such regulations address, among other matters, controls in manufacturing processes, quality control and quality assurance requirements and the maintenance of proper records and documentation. The FDA and other regulatory agencies routinely inspect manufacturing facilities*. The FDA generally will issue a notice on Form 483 if it finds issues with respect to its inspections. If our manufacturing facility or those facilities of our partner and our respective contract manufacturers or processors do not comply with applicable cGMPs and other regulatory requirements, we may be subject to product liability claims, we may be unable to meet clinical demand for our products, and we could suffer delays in the progress of clinical trials for products under development.

18.    The filing also contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Pehl and Garone attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

19.    On May 9, 2018, Immunomedics filed its Form 10-Q for the period ended March 31, 2018, with the SEC, which stated in pertinent part:

*If we, or our collaboration partner, cannot successfully and efficiently manufacture the compounds that make up our products and product candidates, our ability, and the ability of our collaboration partner, to sell products and conduct clinical trials will be impaired.*

Our ability to conduct our pre-clinical and clinical research and development programs depends, in large part, upon our ability to manufacture our proprietary compounds in accordance with the FDA and other regulatory requirements. We have limited historical experience in manufacturing these compounds in significant quantities, and we may not be able to do so in the quantities required to commercialize these products. Any interruption in manufacturing at this site, whether by natural acts or otherwise, could significantly and adversely affect our operations, and delay our research and development programs.

We and our collaboration partner also depend on third parties to provide certain raw materials, manufacturing and processing services. *All manufacturers of pharmaceutical products must comply with current Good Manufacturing Practice regulations or cGMPs, required by the FDA and other regulatory agencies. Such regulations address, among other matters, controls in*

*manufacturing processes, quality control and quality assurance requirements and the maintenance of proper records and documentation. The FDA and other regulatory agencies routinely inspect manufacturing facilities.* The FDA generally will issue a notice on Form 483 if it finds issues with respect to its inspections. If our manufacturing facility or those facilities of our partner and our respective contract manufacturers or processors do not comply with applicable cGMPs and other regulatory requirements, we may be subject to product liability claims, we may be unable to meet clinical demand for our products, and we could suffer delays in the progress of clinical trials for products under development.

20.     The filing also contained signed certifications pursuant to SOX by Defendants Pehl and Garone attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

21.     On May 21, 2018, the Company issued a press release touting its submission of a BLA for sacituzumab govitecan. The press release stated in relevant part:

**Immunomedics Submits Biologics License Application For Sacituzumab Govitecan To The U.S. Food and Drug Administration**
*First-in-Class Antibody-Drug Conjugate had Received Prior Breakthrough Therapy Designation from the FDA for the Treatment of Metastatic Triple-Negative Breast Cancer*
\*\*\*

MORRIS PLAINS, N.J., May 21, 2018 (GLOBE NEWSWIRE) -- Immunomedics, Inc., (NASDAQ:IMMU) ("Immunomedics" or the "Company"), a science-based and innovation-focused biopharmaceutical company committed to the development and worldwide commercialization of its unique and proprietary antibody-drug conjugate (ADC) platform, today announced the submission of a Biologics License Application (BLA) to the U.S. Food and Drug Administration (FDA) for sacituzumab govitecan for the treatment of patients with metastatic triple-negative breast cancer (mTNBC) who previously received at least two prior therapies for metastatic disease. If approved, sacituzumab govitecan would be the first and only ADC approved for the treatment of mTNBC.

"The treatment of TNBC clearly represents an area of high unmet medical need and there are currently only very limited treatment options for mTNBC patients," said Michael Pehl, President and Chief Executive Officer. "Further, the BLA submission of sacituzumab govitecan represents a significant milestone for Immunomedics on our path to unlock the future promise of our unique ADC platform for patients and healthcare professionals. We greatly thank the patients

that participated in our trials along with their caregivers, and look forward to working closely with the FDA."

The filing is based on Phase 1/2 data of sacituzumab govitecan in mTNBC.

22.     On July 18, 2018, the Company issued a press release, filed that same day with the SEC as Exhibit 99.1 to a Form 8-K, touting the FDA's acceptance of the BLA for priority review, stating in relevant part:

### FDA ACCEPTS BIOLOGICS LICENSE APPLICATION FOR FILING AND GRANTS PRIORITY REVIEW FOR SACITUZUMAB GOVITECAN FOR THE TREATMENT OF METASTATIC TRIPLE-NEGATIVE BREAST CANCER
*The Prescription Drug User Fee Act (PDUFA) Target Action Date is January 18, 2019*

Morris Plains, N.J., July 18, 2018 -— Immunomedics, Inc., (NASDAQ: IMMU) ("Immunomedics" or the "Company"), a leading biopharmaceutical company in the area of antibody-drug conjugates (ADC), today announced that the U.S. Food and Drug Administration (FDA) has accepted the Company's Biologics License Application (BLA) for filing and granted Priority Review for sacituzumab govitecan for the treatment of patients with metastatic triple-negative breast cancer (mTNBC) who previously received at least two prior therapies for metastatic disease. **The PDUFA target action date is January 18, 2019**. If approved, sacituzumab govitecan would be the first and only ADC approved for the treatment of mTNBC.

"We are delighted that the FDA has accepted the sacituzumab govitecan BLA for Priority Review," commented Michael Pehl, President and Chief Executive Officer. "We will continue to work closely with the regulatory agency as we strive to bring this potential new treatment to mTNBC patients expeditiously."

23.     On August 23, 2018, Immunomedics filed its Form 10-K for the fiscal year ended June 30, 2018, which stated in pertinent part:

*If we, or any of our collaboration partners, or our or their contract manufacturers, cannot successfully and efficiently manufacture the compounds that make up our products and product candidates, our ability, and the ability of our collaboration partners, to sell products and conduct clinical trials will be impaired.*

Our ability to conduct our preclinical and clinical research and development programs depends, in large part, upon our ability to manufacture our proprietary compounds in accordance with the FDA and other regulatory requirements. We

8

have limited historical experience in manufacturing these compounds in significant quantities, and we may not be able to do so in the quantities required to commercialize these products. Any interruption in manufacturing at this site, whether by natural acts or otherwise, could significantly and adversely affect our operations, and delay our research and development programs.

We and our collaboration partners also depend on third parties to provide certain raw materials, and contract manufacturing and processing services. *All manufacturers of biopharmaceutical products must comply with current Good Manufacturing Practice regulations or cGMPs, required by the FDA and other regulatory agencies. Such regulations address, among other matters, controls in manufacturing processes, quality control and quality assurance requirements and the maintenance of proper records and documentation. The FDA and other regulatory agencies routinely inspect manufacturing facilities, including in connection with the review of a BLA.* The FDA generally will issue a notice on Form 483 if it finds issues with respect to its inspections, to which the facility must adequately respond in order to avoid escalated regulatory concerns. If our manufacturing facility or those facilities of our collaboration partners and our respective contract manufacturers or processors do not comply with applicable cGMPs and other regulatory requirements, in addition to regulatory enforcement, we may be subject to product liability claims, we may be unable to meet clinical demand for our products, and we could suffer delays in the progress of clinical trials for products under development and of potential approval and commercialization.

24.     The Company also touted in its annual report the purportedly positive steps had taken to fulfil its corporate strategy:

Our corporate strategy is to bring sacituzumab govitecan to the market on our own in the United States for the benefit of patients with mTNBC and the creation of value for our stockholders. On May 21, 2018 we submitted a Biologics License Application ('BLA') to the FDA for sacituzumab govitecan for the treatment of patients with mTNBC who have received at least two prior therapies for metastatic disease. On July 18, 2018 we received notification from the Food and Drug Administration ('FDA') that the BLA was accepted for filing and granted Priority Review with a PDUFA target action date of January 18, 2019. *If approved, sacituzumab govitecan would be the first and only ADC approved for the treatment of mTNBC.*

25.     The filing also contained signed certifications pursuant to SOX by Defendants Pehl and Malik attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

26.     On November 7, 2018, Immunomedics filed its Form 10-Q for the period ended

September 30, 2018, with the SEC, which stated in pertinent part:

> *If we, or any of our collaboration partners, or our or their contract manufacturers, cannot successfully and efficiently manufacture the compounds that make up our products and product candidates, our ability, and the ability of our collaboration partners, to sell products and conduct clinical trials will be impaired.*
>
> Our ability to conduct our preclinical and clinical research and development programs depends, in large part, upon our ability to manufacture our proprietary compounds in accordance with the FDA and other regulatory requirements. We have limited historical experience in manufacturing these compounds in significant quantities, and we may not be able to do so in the quantities required to commercialize these products. Any interruption in manufacturing at this site, whether by natural acts or otherwise, could significantly and adversely affect our operations, and delay our research and development programs.
>
> We and our collaboration partners also depend on third parties to provide certain raw materials, and contract manufacturing and processing services. *All manufacturers of biopharmaceutical products must comply with current Good Manufacturing Practice regulations or cGMPs, required by the FDA and other regulatory agencies. Such regulations address, among other matters, controls in manufacturing processes, quality control and quality assurance requirements and the maintenance of proper records and documentation. The FDA and other regulatory agencies routinely inspect manufacturing facilities, including in connection with the review of a BLA.* The FDA generally will issue a notice on Form 483 if it finds issues with respect to its inspections, to which the facility must adequately respond in order to avoid escalated regulatory concerns. If our manufacturing facility or those facilities of our collaboration partners and our respective contract manufacturers or processors do not comply with applicable cGMPs and other regulatory requirements, in addition to regulatory enforcement, we may be subject to product liability claims, we may be unable to meet clinical demand for our products, and we could suffer delays in the progress of clinical trials for products under development and of potential approval and commercialization.

27.     The filing also contained signed certifications pursuant to SOX by Defendants

Pehl and Malik attesting to the accuracy of financial reporting, the disclosure of any material

changes to the Company's internal controls over financial reporting, and the disclosure of all

fraud.

28.    The statements referenced in ¶¶13-27 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Immunomedics' Morris Plains, New Jersey drug substance manufacturing facility was not in compliance with FDA requirements; (ii)  the Company's Quality Control Unit did not possess the authority to investigate and correct critical FDA violations occurring at the Morris Plains, New Jersey facility; (iii) the Company suffered a February 2018 data integrity breach at the Morris Plains, New Jersey facility which, among other issues, included the backdating records and manipulation of bioburden samples; (iv) the Company's Chemistry, Manufacturing and Control data submitted in connection with its BLA for sacituzumab govitecan was insufficient to support FDA approval; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Begins To Emerge**

29.    The truth was partially revealed on December 17, 2018, when FDAnews.com published an article titled "FDA Hits Immunomedics for Data Integrity Breach." The article revealed that the Company had experienced a data integrity breach at its Morris Plains, New Jersey manufacturing facility in February 2018, and failed to take adequate steps to address the issue. In particular, the article stated:

> The FDA cited Immunomedics for a host of violations — including its handling of a data integrity breach — observed at its Morris Plains, New Jersey, drug substance manufacturing facility between August 6 and 14.
>
> The investigation revealed that the firm's quality control unit didn't have the authority to investigate critical deviations that occurred at the facility — namely a February 2018 data integrity breach, which didn't trigger a deviation. This breach included manipulated bioburden samples, misrepresentation of an integrity test

procedure in the batch record, and backdating of batch records, such as dates of analytical results.

In addition, the firm gave no assurance that samples and batch records from commercial batches it manufactured before the data integrity breach were not impacted by it, and the agency was unable to conduct a proper assessment.

30.     On December 17, 2018, following the publication of the FDAnews.com story, Immunomedics shares fell from an opening price of $18.54 to close at $17.86, a decline of 4%.

31.     On December 20, 2018, the truth was fully revealed to the market when Favus Institutional Research issued a Report (the "Favus Report") discussing the data integrity breach.

32.     Following the Favus Report the Company's stock price fell drastically, from $17.64 at close on December 19, 2018 to $14.17 at close on December 20, 2018, a drop of 20%.

33.     Then on January 17, 2019, the Company announced that it "received a Complete Response Letter (CRL) from the U.S. Food and Drug Administration (FDA) for the Biologics License Application (BLA) seeking accelerated approval of sacituzumab govitecan for the treatment of patients with metastatic triple-negative breast cancer (mTNBC) who have received at least two prior therapies for metastatic disease." In the CRL, the FDA raised issues related to approvability "focused on Chemistry, Manufacturing and Control matters."

34.     Following the news of the CRL, the Company's stock price fell drastically, from $18.09 at close on January 17, 2019 to $13.31 at close on January 18, 2019, a drop of approximately 26%.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

35.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the Company's securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are

Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

36.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, the Company's securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

37.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

38.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

39.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of the Company;

- whether the Individual Defendants caused the Company to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

40.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

41.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- the Company's securities are traded in an efficient market;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

42.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

43.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in Affiliated Ute Citizens of the State of Utah v. United States, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

44.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

45.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

46.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to,

and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of the Company's securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire the Company's securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

47.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for the Company's securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company's finances and business prospects.

48.    By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

49.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of the Company's internal affairs.

50.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to the Company's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of the Company's securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning the Company's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired the Company's securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

51.     During the Class Period, the Company's securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of the Company's securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or

otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of the Company's securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of the Company's securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

52.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

53.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)

54.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

55.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs.  Because of their senior positions, they knew the adverse non-public information about the Company's misstatement of income and expenses and false financial statements.

56.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

57.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations.   Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act.   In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

58.     Each of the Individual Defendants, therefore, acted as a controlling person of the Company.   By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein.   Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

59.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated:  February 8, 2019

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jonathan D. Lindenfeld*
Jonathan D. Lindenfeld
Jeremy A. Lieberman*
J. Alexander Hood II*
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
         ahood@pomlaw.com
         jlindenfeld@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom*
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

*pro hac vice* applications forthcoming

***Attorneys for Plaintiff***

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.    I,   Chongho Choi                          , make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2. I have reviewed a Complaint against Immunomedics, Inc. ("Immunomedics" or the "Company"), and authorize the filing of a comparable complaint on my behalf.

3.  I did not purchase or acquire Immunomedics securities at the direction of plaintiffs counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.   I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired Immunomedics securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.   To the best of my current knowledge, the attached sheet lists all of my transactions in Immunomedics securities during the Class Period as specified in the Complaint.

6.   During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7.   I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.   I declare under penalty of perjury that the foregoing is true and correct.


**Executed** _____January 29, 2019_____
                       **(Date)**

_____
                      **(Signature)**


_____CHONGHO CHOI_____
                **(Type or Print Name)**

**Immunomedics, Inc. (IMMU)**                                                    **Choi, Chongho**

### List of Purchases and Sales

| Security Type | Date | Purchase or Sale | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|---|
| Common Stock | 8/30/2018 | Purchase | 200 | $26.3900 |
| Common Stock | 9/17/2018 | Purchase | 100 | $22.5300 |
| Common Stock | 9/27/2018 | Purchase | 100 | $20.7700 |
| Common Stock | 9/27/2018 | Purchase | 100 | $20.7700 |
| Common Stock | 12/17/2018 | Purchase | 300 | $18.1200 |
| Common Stock | 12/20/2018 | Purchase | 100 | $14.2577 |
| IMMU Feb 15 2019 15.0 Put | 11/14/2018 | Sale | 4 | $1.9500 |
| IMMU Feb 15 2019 17.0 Call | 11/12/2018 | Purchase | 2 | $5.7000 |
| IMMU Feb 15 2019 17.0 Call | 12/10/2018 | Purchase | 2 | $4.6000 |
| IMMU Oct 19 2018 21.0 Call | 9/21/2018 | Purchase | 3 | $1.7000 |
| IMMU Oct 19 2018 21.0 Call | 10/17/2018 | Sale | 3 | $1.1000 |